IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **N. O., A MINOR,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:15-cv-868** |
| | ) | |
| **MARC ALEMBIK,** *et al.*, | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

At issue pre-trial in this diversity medical malpractice case are defendants' motions *in limine* to preclude certain of plaintiffs' evidence. Specifically, defendants seek:

> (i) to preclude plaintiffs' standard of care expert, Dr. Douglas Phillips, M.D., from testifying as unqualified under the Virginia Medical Malpractice Act; and

> (ii) to preclude plaintiffs' causation expert, Dr. Craig Cohen, M.D., from testifying because his expert report does not comply with the requirements of Rule 26(a)(2)(B), Fed. R. Civ. P.

The motions were fully briefed, argued, and denied in rulings from the Bench. This Memorandum Opinion records and elucidates the reasons for those rulings.

## I.

The unfortunate events giving rise to this litigation may be succinctly summarized.[1]

Plaintiffs Christine Orwig and her minor child N.O. are citizens of Texas. In 2011, Ms. Orwig resided in Woodbridge, Virginia, while pregnant with N.O. During her pregnancy, Ms. Orwig received medical care at defendant About Women Ob/Gyn, P.C., specifically from defendant Dr. Marc Alembik, M.D., a physician employed with About Women Ob/Gyn, P.C. Ms. Orwig

---

[1] This statement of facts derives from the allegations in plaintiffs' Complaint and the materials related to the instant motions.

alleges that on or about September 28, 2011, when she was approximately twenty-eight weeks pregnant with N.O., Ms. Orwig's membranes prematurely ruptured, which caused her amniotic fluid to leak. Rather than deliver N.O. at that time, defendants placed Ms. Orwig on bedrest, which in turn put Ms. Orwig and N.O. at a risk of infection. Thereafter, on or about October 13, 2011, Ms. Orwig presented signs of an infection; by 2:30 p.m. that day defendants documented that Ms. Orwig likely had chorioamnionitis, a bacterial infection in the fetal membranes. Defendants then elected to induce labor and deliver N.O. vaginally rather than through cesarean section, a decision that plaintiffs allege exposed N.O. to a risk of infection for approximately eleven hours. Upon delivery, N.O. was diagnosed with meningitis and sepsis and subsequently developed a Grade III bleed and hydrocephalus, from which N.O. now permanently suffers.

Plaintiffs allege that defendants were negligent (i) by failing to prescribe appropriate medication to guard against known causes of chorioamnionitis (specifically, medication such as Gentamicin that guards against gram negative pathogens); (ii) by failing to monitor Ms. Orwig's condition while knowing that chorioamnionitis was on the differential diagnosis; and (iii) by failing to perform a timely cesarean delivery of N.O. in the face of likely infection, choosing instead to deliver N.O. vaginally. Defendants contend that the clinical requirements for a diagnosis of chorioamnionitis were not present and that there is no proximate causation between any failure to administer an appropriate antibiotic regimen and N.O.'s subsequent medical complications.

**II.**

Defendants' first motion *in limine* seeks to preclude the testimony of plaintiffs' standard of care expert, Dr. Phillips. Specifically, defendants argue that Dr. Phillips is not qualified as an expert under Virginia's Medical Malpractice Act. Although the admissibility of evidence in

2

federal court is generally governed by the Federal Rules of Evidence, because Virginia's state

law requirements for the admissibility of expert opinions in medical malpractice cases are so

central to the state's substantive policy, the Virginia state law standard applies in federal court.

*See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690-91 (4th Cir. 2011) ("[B]ecause the

testimony at issue here was required for a medical malpractice claim under Virginia law, the

sufficiency of its substance to meet plaintiff's prima facie case is governed by state law.").

The relevant Virginia statute requires experts seeking to testify on the standard of care in

medical malpractice cases to meet certain qualifications. The statute provides:

> A witness shall be qualified to testify as an expert on the standard of care if he
> demonstrates expert knowledge of the standards of the defendant's specialty and
> of what conduct conforms or fails to conform to those standards and if he has had
> active clinical practice in either the defendant's specialty or a related field of
> medicine within one year of the date of the alleged act or omission forming the
> basis of the action.

Va. Code § 8.01-581.20(A). Thus, Virginia law imposes two requirements for experts who seek

to testify regarding the applicable standard of care. First, there is a "knowledge" requirement that

focuses on the expert's knowledge of, and experience with, the specific procedure at issue.

*Creekmore*, 662 F.3d at 691 (citing *Jackson v. Qureshi*, 277 Va. 114, 122 (2009)). Second, there

is an "active clinical practice" requirement that excludes "testimony by an individual who has

not recently engaged in the actual performance of the procedures at issue in a case." *Sami v.*

*Varn*, 260 Va. 280, 285 (2000). Specifically, a proposed expert must have performed the

procedure in issue within one year of the date of the alleged negligent act or omission. Va. Code

§ 801-581.20(A).

The instant motion *in limine* focuses on the "active clinical practice" requirement. *Id.* In

this respect, the Supreme Court of Virginia has instructed that the "active clinical practice"

analysis must be conducted by looking at the context of the actions by which a defendant is

alleged to have deviated from the standard of care. The Supreme Court of Virginia's decision in

*Hinkley v. Koehler*, 269 Va. 82, 89 (2005), well illustrates this point. There, a plaintiff sued for

medical malpractice alleging that the defendant failed to provide appropriate "management,

treatment, and delivery decisions" during plaintiff's pregnancy with twins through the

defendant's failure to engage in appropriate testing in the face of decreased fetal movements and

failure to intervene surgically to save the life of one twin after the other twin had already died *in*

*utero. Id.* at 89-90. The Supreme Court of Virginia noted that the "negligence forming the basis

of [the] action arose out of the direct patient care provided to [plaintiff] during her pregnancy"

and did *not* involve any "specific procedure nor the physical process of delivering a baby." *Id.*

Ultimately, the Supreme Court of Virginia concluded that plaintiff's expert was unqualified; the

expert was a teacher and consultant, but there was insufficient evidence that the expert conducted

"direct patient care" that required the expert to "evaluate, manage, or treat problems in

pregnancies." *Id.* at 90. The expert in *Hinkley* sought to establish his qualification by noting that

he "actually talked to two patients for whom he was acting as a consultant," but the Supreme

Court of Virginia concluded that this was insufficient to constitute active clinical practice. *See id.*

Defendants rely chiefly on *Hinkley* to argue that Dr. Phillips does not qualify as an

expert. Specifically, defendants contend that Dr. Phillips does not qualify because he (i) teaches

and primarily consults with respect to deliveries, (ii) has not performed vaginal deliveries or

been the "lead obstetrician" in a cesarean section since 2004, and (iii) did not handle the

intrapartum management of a patient diagnosed with clinical chorioamnionitis except in a

consulting capacity in the relevant statutory timeframe of October 2010 to October 2012. This

argument over-reads *Hinkley* and, moreover, ignores that *Hinkley* is distinguishable from the

instant case.

4

Defendants over-read *Hinkley* by attempting to limit the scope of relevant clinical practice to "the direct intrapartum management of a patient with a clinical diagnosis of chorioamnionitis." This too narrowly circumscribes the relevant scope of practice, as *Hinkley* illustrates. Contrary to defendants' argument, *Hinkley* does not call for reference to a narrow and specific procedure, such as the treatment of chorioamnionitis specifically. The alleged failure to conform to the standard of care here did not involve one specific procedure or delivery technique. Rather, as in *Hinkley*, plaintiff Orwig presented with signs of antepartum and intrapartum distress, and the situations in *Hinkley* and in the instant case presented the doctors with essentially the same problems: how to monitor the complications and how to treat the complications, including whether to intervene surgically. In *Hinkley*, the Supreme Court of Virginia did not classify the relevant clinical practice as "direct intrapartum management of a patient with decreased fetal movements, contractions, and the *in utero* death of one twin." To the contrary, the Supreme Court of Virginia framed the inquiry more broadly as the evaluation, management, and treatment of problems in pregnancies. *Id.* So, too, here. The relevant level of analysis should focus on whether Dr. Phillips evaluated, managed, or treated problems in pregnancies, which he did.[2] Accordingly, defendants' attack on Dr. Phillips's qualifications in this regard fails.

Moreover, Dr. Phillips's practice is readily distinguishable on the facts from the expert in *Hinkley*. Specifically, the plaintiff's expert in *Hinkley* did not engage in "direct patient care," and

---

[2] It is worth noting that the record reflects that even if the relevant procedures are circumscribed to "direct intrapartum management of patients with intrapartum infections generally," Dr. Phillips still qualifies. *See* Phillips Dep. 159:7-16 (Dr. Phillips ordered antibiotics for patients with intrapartum infections in the relevant time period). *Cf. Wright v. Kaye*, 267 Va. 510, 523 (2004) (rejecting the argument "that an expert witness must have performed the same medical procedure with the same pathology in all respects as gave rise to the alleged act of malpractice at issue in order to have practiced in the defendant's specialty").

the Supreme Court of Virginia's analysis suggests that the motivating concern was that the

expert in *Hinkley* was not actually interacting with patients. That is, the Supreme Court of

Virginia specifically mentioned that the expert in *Hinkley* pointed to only two examples of

instances in which he spoke with patients directly in the relevant timeframe. In stark contrast, Dr.

Phillips's practice involves significant direct patient care and patient interaction. For example,

Dr. Phillips:

> (i) meets with patients—including high-risk patients—in his office at a clinic, Phillips
> Dep. 10:13-15, 26:10-12;

> (ii) is involved in admitting patients for antepartum care, *id.* 14:18-22;

> (iii) assists with cesarean section deliveries (which require two people), which can
> involve as much as "doing half the case," *id.* 14:22-25, 18:19-19:8;

> (iv) performs "on call" duty during which patients with problems arising in the evening
> call him directly for assistance, usually once every third or fourth night, *id.* 27:15-28:2;
> and

> (v) "did in fact give orders for antibiotics for patients who had been diagnosed with
> intrapartum infections," between October 2010 and October 2012 while "consulting," *id.*
> 159:8-16.

Thus, the record reflects that Dr. Phillips's clinical practice involves frequent and direct patient

contact (including for high-risk patients), direct involvement in delivery, and the giving of orders

for treatment of patients with intrapartum infections. Accordingly, the concerns that motivated

the Supreme Court of Virginia to determine that the expert in *Hinkley* was unqualified—namely

that the expert there did not engage in "direct" patient care in the sense of patient interaction—

are not present in this case.

Thus, Dr. Phillips satisfies Virginia's standards for the admissibility of expert testimony,

and the motion to preclude his testimony must be denied.

## III.

Defendants next seek to preclude plaintiffs' causation expert, Dr. Cohen, from testifying by arguing that his expert report is insufficient. Specifically, defendants argue that Dr. Cohen's expert report does not satisfy the requirements of Rule 26, Fed. R. Civ. P., because, according to defendants, Dr. Cohen's report offers only one conclusory line with respect to the administration of Gentamicin without a supporting basis. Dr. Cohen's report states in pertinent part:

> Had the standard of care been followed, the infant would have had broad
> spectrum antibiotic coverage that included Gram negative bacteria such as *E. Coli*
> prior to delivery, and more likely than not this would have prevented the
> intracranial hemorrhage and other complications.

Doc. 21, Ex. 1. Defendants also argue that Dr. Cohen's deposition testimony reveals that Dr. Cohen lacks the requisite knowledge of Gentamicin to be permitted to testify. Although defendants do not couch their objection to Dr. Cohen's knowledge in terms of Rule 702, Fed. R. Evid., it is worth engaging in the Rule 702 analysis for the sake of completeness.

## A.

With respect to defendants' Rule 26 challenge to Dr. Cohen's expert report, analysis properly begins with the Rule's text. Under Rule 26(a)(2)(B), an expert report must contain, as relevant here, (i) "a complete statement of all opinions the witness will express and the basis and reasons for them" and (ii) "the facts or data considered by the witness in forming" the opinion. Failure to provide the necessary information results in the automatic sanction of exclusion "unless the failure was substantially justified or is harmless." *See* Rule 37(c)(1), Fed. R. Civ. P., cmt. to 1993 amendments.

Defendants' objection that Dr. Cohen's expert report is conclusory and fails to disclose the basis for his opinion or the facts or data upon which he relied is of no moment. Read in context, Dr. Cohen's expert report discloses sufficient support for his conclusion. Indeed, Dr.

Cohen cites "the available medical records, the deposition testimony of Ms. Orwig, as well as [his] training, education and experience, the medical literature and specifically ACOG Clinical Management Guidelines for Obstetrician-Gynecologists, Number 80, April 2007" to support the conclusion that defendants should have administered an antibiotic covering gram negative bacteria at the time of the chorioamnionitis diagnosis. Doc. 21, Ex. 1. After reaching his conclusion, Dr. Cohen goes on to explain, based on N.O.'s medical record at birth and his own experience, that if anything other than chorioamnionitis caused N.O.'s condition, then N.O.'s clinical condition at birth would have been much worse. Thus, Dr. Cohen's causation theory is clear: (i) N.O. was at risk from chorioamnionitis, (ii) the accepted medical response to such a risk is the introduction of antibiotics covering gram negative bacteria, (iii) and N.O.'s condition at birth indicates that the cause of the complications was chorioamnionitis. Thus, following the accepted medical procedure would have reduced the risk of chorioamnionitis and, as a result, reduced the risk of complications.

Defendants further object that, at his deposition, Dr. Cohen could not state whether N.O. specifically would have seen any reduction in complications had appropriate antibiotics been administered; rather, in defendants' view, Dr. Cohen relied on generalized statistical evidence. This objection is irrelevant to the analysis under Rule 26, which merely requires disclosure. Simply put, defendants' objection is essentially an argument that Dr. Cohen's conclusion is incorrect, but whether Dr. Cohen drew the correct inferences from generalized statistical evidence is a question of weight for the jury. To the extent Dr. Cohen's deposition testimony undercuts the conclusion he has disclosed in his report, that testimony merely creates a credibility issue. *Cf. In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531 (6th Cir. 2008) ("The

question of whether [an expert's] opinion is accurate in light of his use of...data goes to the weight of the evidence, not to its admissibility.").

Because Dr. Cohen's expert report satisfies Rule 26's disclosure requirements, there is no discovery violation for which the sanction of exclusion is appropriate.

**B.**

Although defendants do not attack Dr. Cohen's knowledge in an attempt to disqualify him from testifying as an expert,[3] it is appropriate to consider whether Dr. Cohen qualifies as an expert under Rule 702, Fed. R. Evid. Rule 702 recognizes five bases for qualifying as an expert: "knowledge, skill, experience, training, or education." It is well-settled that an expert can satisfy Rule 702's requirement by meeting any one of the five bases for qualification. *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed."); 29 Wright & Gold, <u>Federal Practice and Procedure: Evidence</u> § 6265 at 244-45 (1997). It is equally well-settled that gaps in an expert's knowledge generally go to the weight of the witness's testimony, not its admissibility. *See id.* at 251 (citing, *inter alia, Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.")).

Even without Rule 702's relatively liberal standard to qualify as an expert, Dr. Cohen would easily clear the bar. Dr. Cohen is qualified to testify on medical causation by virtue of his education, having earned both a doctor of medicine and masters of public health degree. Doc. 21, Ex. 1. He is further qualified by virtue of his training, as he completed a residency in obstetrics

---

[3] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").

and gynecology at Northwestern University and a post-doctoral fellowship at the University of Washington. *Id.* As to his experience, Dr. Cohen has a long history of work in the reproductive infectious disease field, including his current appointment as a professor in the Department of Obstetrics, Gynecology and Reproductive Sciences at the University of California, San Francisco, and as an attending physician at San Francisco General Hospital. *Id.* Finally, Dr. Cohen's knowledge in the field is established by his publication of numerous articles regarding reproductive infectious disease in peer-reviewed journals. *Id.*

Notwithstanding these qualifications, defendants attack Dr. Cohen on the basis that, at his deposition, Dr. Cohen could not describe the precise chemical manner in which Gentamicin operates to treat gram negative bacterial infections, something defendants suggest an expert in infectious disease should know. Indeed, defendants take particular issue with the fact that Dr. Cohen testified that he would need to "look up" a particular fact about the drug. This attack is frivolous. To expect Dr. Cohen to know off the top of his head how every drug for treating infectious disease works, in detail, is on par with expecting every federal litigator to know off the top of his head the details of every section of Title 28 of the U.S. Code. Rule 702 does not demand such encyclopedic knowledge. To be sure, defendants are correct that it is appropriate to focus sharply on Dr. Cohen's specialty, but defendants offer no reason or authority to explain why an infectious disease specialist—as opposed to, for example, a pharmacologist—should know exactly how a given drug works off the top of his head. Moreover, the deposition testimony on which defendants rely clearly shows that Dr. Cohen understands how to treat gram negative pathogens, *i.e.*, kill them or prevent their reproduction. Cohen Dep. 118:16-119:3. The only thing Dr. Cohen could not *remember* (as opposed to defendants' characterization that he did not "know") was whether Gentamicin killed the bacteria or prevented reproduction. *See id.*

10

118:12-15. But as long as either is sufficient to treat the infection, as Dr. Cohen's testimony

suggests is the case, the specific mechanics of Gentamicin's chemical operation are irrelevant to

whether its administration is capable of preventing the infection-related complications at issue

here, which is Dr. Cohen's ultimate conclusion.

Accordingly, it is pellucid that in addition to providing adequate Rule 26 disclosures, Dr.

Cohen is also qualified as an expert under Rule 702. To the extent defendants question the scope

of Dr. Cohen's knowledge, they are at liberty to cross-examine him before a jury, as such

concerns go to the weight of the testimony.

## IV.

For the foregoing reasons, defendants' motions *in limine* to preclude the testimony of Dr.

Phillips and the testimony of Dr. Cohen must be denied. An appropriate order has already issued.

Alexandria, Virginia
January 4, 2016

/s/
_____
T. S. Ellis, III
United States District Judge

11